[Crim. No. 42616. Second Dist., Div. Seven. June 7, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE WILLIAM LEWIS, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Diane M. L. Tan, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Daniel J. Kremer, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Shunji Asari and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—Defendant George William Lewis appeals from a judgment upon a jury conviction of violation of Penal Code section 246, unlawfully

discharging a firearm at an inhabited and occupied dwelling house, house car and camper. The issues on appeal are whether the trial court committed prejudicial error (1) in removing appellant Lewis from the courtroom and holding him in the lockup during his trial in view of the fact that appellant refused to participate in the trial and expressed a desire to be placed in lockup and (2) in failing to instruct the jury *sua sponte* to disregard appellant's absence from the courtroom in reaching a verdict, given the fact that the jurors were examined for possible prejudice during voir dire by both the trial judge and defense counsel. Based on a review of the totality of the record and the specific facts in this case, we conclude that the trial court was justified in removing defendant from the courtroom and that the lack of instruction does not constitute reversible error.

## I. FACTS AND PROCEEDINGS BELOW

On the first day of trial, immediately after the swearing in of the prospective jurors and in their presence appellant Lewis stated that he objected to the composition of the jury venire because there were no blacks in it and stated that he would not participate in the trial.[1] The trial judge then asked the members of the prospective jury to step outside into the hallway. With the prospective jury panel excluded, appellant reiterated that he would not participate in the trial unless there were some blacks on his jury, that he would be disruptive of the proceedings unless he was bound and gagged in the courtroom, and that he would prefer to remain outside the courtroom during the trial proceedings.[2] Defense counsel moved for mistrial since all

---

[1] The following colloquy took place in the presence of the members of the prospective jury panel:

"THE COURT: Good morning, Ladies and Gentlemen. This is the case of People versus George William Lewis, L-e-w-i-s.

". . . . . . . . . . . . . . . . . . . .

"Mr. Lewis was duly arraigned on the felony charge, entered a plea of not guilty and now stands before you ready for trial today.

"Mr. Lewis, would you kindly stand, face the jury panel, sir.

"THE DEFENDANT: Yes. I'd also like to say—don't tell me—

"I don't see no blacks here in this courtroom other than my witness, me. I want some blacks on my jury.

"THE COURT: Have a seat, Mr. Lewis.

"THE DEFENDANT: I'm not even going to participate in the trial.

"THE COURT: Will all the prospective jury panel members please step outside into the hallway and we'll call you back in a few minutes."

[2] The following colloquy took place after the prospective jury panel was excluded from the courtroom:

"THE COURT: All right, the record will reflect the jury panel has been excluded. All right, Mr. Lewis, do you wish to be heard?

"THE DEFENDANT: Yes, I do. If you don't have any black jurors, you got over twenty-some thousand, go downtown and get some.

"THE COURT: You're not telling me what to do.

"THE DEFENDANT: I'm telling you, I'm not going to participate in this trial voluntarily

the prospective jurors had heard appellant's objections to the absence of blacks in the jury venire. The court indicated it would be willing to obtain 35 new jurors if appellant would remain in the courtroom and take part in the trial. The court could not guarantee, however, that the new panel would include any black members. Appellant reaffirmed his intention to disrupt the proceedings and his preference to be in the lockup than to participate in the trial.[3] On the basis of appellant's statements, the court ordered that the trial proceed with appellant in the lockup and denied the motion for mistrial.

---

unless some blacks are in here. I am black.

"THE COURT: The record will reflect that you are. Okay, to the fact that there are no members of black on the jury panel, that would be noted on the record.

"This issue, if the matter goes through the trial and you are convicted, then you certainly have the right to make any motions for appeal on that basis.

"THE DEFENDANT: You're just going to have to chain me down in here and gag me, because I'm not participating in any trial proceedings. It's simple as that.

"THE COURT: Do you want to have a seat or are you not going to have a seat? Because, I do have a right, if you will not participate and if you want to be disruptive in the courtroom, I will tell you at this time that we will take you and we will put you in the lockup.

"THE DEFENDANT: Put me in the lockup.

"THE COURT: And we'll proceed in the trial without you."

[3]"THE DEFENDANT: May I address the Court?

"THE COURT: Surely.

"THE DEFENDANT: My position is just as I said. I'm not participating voluntarily in no trial and not being represented in the jury box by any blacks.

"I am black, as I stated before, the only black in here is my witness, the clerk, the bailiff and myself.

"Now, you can chain me down or do whatever you want to do or you can put me in that tank and I will have my trial in there and it's simple as that.

"THE COURT: The record should reflect we have a speaker in the jail cell—

"THE DEFENDANT: Well, I'm not voluntarily participating in no trial if there's no blacks on my jury.

"THE COURT: You mean on the jury, you mean sitting on the panel itself?

"THE DEFENDANT: Right there.

"THE COURT: Sitting on the panel itself?

"THE DEFENDANT: Right, that's what I am talking about.

"THE COURT: There's no guaranty, I will not guarantee that.

"THE DEFENDANT: Might as well take me back in the tank and chain me down and stick a gag in my mouth.

"THE COURT: All right, I feel no need for another panel, Mr. Green.

"MR. GREEN: One minute.

"THE COURT: I'm satisfied he has—he's expressed his opinion that he does not wish to participate in this matter, and as far as this Court is concerned, he will be—well, let me ask you this: If we proceed at this time, which I am going to do, I will allow you to sit there on the basis if you don't become disruptive. But, if you become disruptive, I might as well have you removed at this time.

"THE DEFENDANT: Look, I don't mean to be a hardship to the court.

"THE COURT: Okay.

"THE DEFENDANT: Now, you're telling me I'm facing five years if I'm convicted on this here—whatever it is.

"THE COURT: Four.

"THE DEFENDANT: It's not my case.

"THE COURT: Okay.

"THE DEFENDANT: But you're going to tell me something about if I'm convicted by an

Appellant was absent from the courtroom while the selection of the jury commenced. Appellant was able to listen to the proceedings in the adjacent lockup by means of a loudspeaker system. During the voir dire examination the trial judge asked prospective members of the jury whether appellant Lewis' statement or absence from the courtroom would affect their ability to render an impartial decision.[4] The jurors responded in the negative. The trial court also admonished the jury during voir dire that the incident involving appellant was not to be discussed or considered by them in determining appellant's guilt or innocence. During voir dire, defense counsel also asked prospective jurors as a group[5] and individually whether any one

---

all white jury that the appellate court, a deal with that. I don't want it to go to the appellate court. I don't want it to go any further than this superior court.

"THE COURT: But, you're not answering my question. My question: Are you going to sit there—

"THE DEFENDANT: No. If you got all white jury, no. You might as well take me back in the tank, because I'm going to be disruptive.

"THE COURT: All right. The Court is satisfied the defendant would create a problem and the jurors have seen him and we will proceed with the defendant in the lockup."

[4]The following appears in the record: "THE COURT: All right. Now, I will take up this particular issue at this time is, as you know, Mr. Lewis is not present in the courtroom. And there's no reason to tell you that Mr. Lewis is on the other side of that door in that door, and there is a speaker. Mr. Lewis can hear everything that is going on during this particular trial. Now, that factor influence you as far as—and this goes to all the jury panel members and the ones out in the audience, would that factor influence you as far as being a juror?

"(The prospective jury panelists answered in the negative.)

"THE COURT: Would the fact that he will not be sitting here at counsel table alongside of his attorney during the course of the trial? This trial may take into a portion of next week, and he will—could be or could not be sitting next to his attorney during the course of that trial.

"Would that factor affect you so that you could not be fair and impartial to both sides?

"(The prospective jury panelists answered in the negative.)

"THE COURT: I believe all of you heard Mr. Lewis make his comments; did you not, before you were excluded from the courtroom?

"(The prospective jury panelists answered in the affirmative.)

"THE COURT: And basically, Mr. Lewis indicated that he was black and that no members of the prospective panel were black.

"Would that factor influence any of your prospective jurors, based upon his making that comment, number one?

"(The prospective jury panelists answered in the negative.)

"THE COURT: The fact that Mr. Lewis is black, would that factor in and of itself influence any of you so you could not give Mr. Lewis a fair and impartial trial in this matter?

". . . . . . . . . . . . . . . . . . . . .

"THE COURT: You know he's entered a plea of not guilty and stands before you ready for trial this date. His objection and the voice of his objection was primarily just that one factor was the fact that there were no prospective blacks on the panel."

Thereafter several jurors were excused for a variety of reasons.

[5]Defense counsel began his voir dire of the jury by examining the jurors as a group for cause:

"THE COURT: All right, Mr. Green, you may examine for cause, sir.

"MR. GREEN: Thank you.

"Ladies and gentlemen, let me start by saying that I have known Mr. Lewis for some

could not be fair in view of appellant's comments. Each juror answered in the negative.

At the beginning of each session of court, the trial court asked appellant Lewis whether he wished to participate in the trial. Appellant indicated through defense counsel that he wished to remain in the lockup. Appellant absented himself during the entire trial. The jury was advised at each session that appellant was in a room adjacent to the courtroom, listening to the trial proceedings by means of a speaker.[6]

The jury deliberated approximately five hours, with an intervening weekend, and returned a verdict of guilty.

## II. ISSUES ON APPEAL

We assume no error was committed in composing the venire assembled for this trial. We empathize with appellant's concern upon seeing no members of his race among the venire. ■ But there is no absolute right to trial by a jury of one's own race or even to a jury reflecting a cross-section of the community. California adheres "to the long-settled rule that no litigant has the right to a jury that mirrors the demographic composition of the population, or necessarily includes members of his own group, or indeed is

---

time and I can assure you that he meant nothing personal about what he said. All of us are entitled to a jury of their peers, and in his particular case he considers his peers to be some black people.

"Now again, I can assure you that he did not mean that personally, that you individually are bad people or you could not be fair, but I just want you to understand what I believe his viewpoint is.

"So again, is there anyone, based on what you heard him say, who at this time feels that they just can't be fair? They feel that Mr. Lewis put pressure on them or they don't like what he said? Is there anybody that feels that way?

"I see some blank faces, some people shaking their head.

"This is my opportunity, and later [the prosecution] will have his opportunity to ask you these questions. We're not asking them to put you on the spot or to make you feel uncomfortable. We're trying and honestly trying to make sure that we're each going to have 12 fair jurors who we both can depend on to give us a fair trial.

"To do that, it requires frank and honest answers from you, candid responses. Please don't answer the questions the way you think I want to hear it or Mr. Bronstein wants to hear it. Please answer it the way you truly feel.

"We're not here to embarrass you. I want to ask you if Mr. Lewis' comments created any doubt in your mind that you could be fair in this case. Please tell me that, I really want to hear that.

"If you did, we're not going to say anything about it. I just really want to know what your feelings are.

"Again, is there anybody here that feels that he could not be a fair juror as a result of what they heard Mr. Lewis say?

"(The prospective jury panelists answered in the negative.)"

[6]Defendant was brought into the courtroom for purposes of identification on three occasions. There is no indication in the record that he was in any type of physical restraint or shackles during those appearances.

composed of any particular individuals." (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 277 [148 Cal.Rptr. 890, 583 P.2d 748], citing *People* v. *White* (1954) 43 Cal.2d 740, 749 [278 P.2d 9]; *People* v. *Breckenridge* (1975) 52 Cal.App.3d 913, 920 [125 Cal.Rptr. 425]; *People* v. *Spears* (1975) 48 Cal.App.3d 397 [122 Cal.Rptr. 93].)

Defendant's right is to have the venire composed through a process calculated to produce a representative cross-section. (*Peters* v. *Kiff* (1972) 407 U.S. 493, 500 [33 L.Ed.2d 83, 92, 92 S.Ct. 2163] [jury must be drawn from sources which produce a " 'fair possibility for obtaining a representative cross-section of the community' "]; *People* v. *Jones* (1973) 9 Cal.3d 546, 556 [108 Cal.Rptr. 345, 510 P.2d 705]; *Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 59-60 [115 Cal.Rptr. 247, 524 P.2d 375].) He also is entitled to a venire drawn from the district where the crime occurred. (*Williams* v. *Florida* (1970) 399 U.S. 78 [26 L.Ed.2d 446, 90 S.Ct. 1893, 96 S.Ct. 1914]; *People* v. *Jones, supra,* 9 Cal.3d 546, 554-557; *People* v. *Taylor* (1975) 46 Cal.App.3d 513, 525 [120 Cal.Rptr. 762] [upholding trial by jury drawn entirely from Northwest District of Los Angeles County]; *People* v. *Casillas* (1973) 33 Cal.App.3d 1078, 1080 [109 Cal.Rptr. 579].) Furthermore, defendant has a right to have the jury itself selected from the venire in a manner which does not exclude members of his race through peremptory challenges based on group bias. (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 277-279; *People* v. *Fuller* (1982) 136 Cal.App.3d 403 [186 Cal.Rptr. 283].)

What happened in this case apparently was the eventuality foreseen by the California Supreme Court in *Wheeler.* "The best the law can do to accomplish those steps with the least risk to the representative nature of the jury pool is to take them by random means, i.e., by drawing lots. We recognize that in a predictable percentage of cases the result will be a wholly unbalanced jury, usually composed exclusively of members of the majority group. This is inevitable, the price we must pay for juries of a workable size." (22 Cal.3d at p. 277.)

Appellant was advised at the time of trial that he could raise the absence of blacks among the venire as an issue on appeal. However, appellant asserts no such contention in his brief. No facts nor allegations have been brought to our attention suggesting venire are composed or juries selected in the Van Nuys Superior Court in ways which discriminate against blacks. Thus we have no basis for considering this issue on appeal.

Appellant instead makes three other contentions on appeal: (1) there was no "manifest need" to remove defendant from the courtroom or restrain appellant and therefore the trial court committed prejudicial error by re-

moving defendant from the courtroom; (2) the trial court's failure to instruct the jury *sua sponte* to disregard appellant's absence from the courtroom in determining his guilt or innocence compounded the previous error; and (3) because the error was not harmless beyond a reasonable doubt, the conviction must be reversed.

III. DEFENDANT WAS PROPERLY ALLOWED TO BE ABSENT FROM THE COURTROOM DURING HIS TRIAL WITHOUT A SHOWING OF "MANIFEST NEED"

Our Supreme Court has held that no person charged with an offense can be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of "manifest need" for such restraints. (*People* v. *Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) The court defined the term "'physical restraints'" to include "all forms of handcuffs, shackles, manacles, leg irons, *and other restraining devices.*" (*Id.* at p. 288, fn. 5. Italics added.) ▮▮▮ Appellant, in the case at hand, contends that removal of the defendant from the courtroom constitutes the use of a "restraining device" as contemplated by *Duran* and that therefore a showing of manifest need was required before defendant could be removed from the courtroom.

In *Duran,* the Supreme Court traced the origin of the rules governing the use of physical restraints in English common law and subsequent holdings of California cases. In the early cases reviewed by the court, in the *Duran* case itself, and in the cases following *Duran,* the courts have been concerned with the use of devices, such as shackles, leg irons, handcuffs or manacles, which are applied directly to the defendant's person rather than with removal of the defendant from the courtroom. (*People* v. *Duran, supra,* 16 Cal.3d 282 [defendant in wrist and ankle restraints]; *Solomon* v. *Superior Court* (1981) 122 Cal.App.3d 532 [177 Cal.Rptr. 1] [defendant handcuffed]; *People* v. *Zatko* (1978) 80 Cal.App.3d 534 [145 Cal.Rptr. 643] [defendant shackled]; *People* v. *Jacla* (1978) 77 Cal.App.3d 878 [144 Cal.Rptr. 23] [defendant shackled].)

An entirely different set of constitutional provisions, statutes and court decisions apply to a criminal defendant's absence from the courtroom. This body of law has developed its own standards which do not speak of "manifest need" and the prejudicial effect on the jury of constantly seeing defendants shackled or gagged. Instead the emphasis is on defendants' rights to physically confront the witnesses against them and to participate effectively in their own defense.

The confrontation clause of the Sixth Amendment to the United States Constitution provides that: "In all criminal prosecutions, the accused shall

enjoy the right . . . to be confronted with the witnesses against him; . . .'' The United States Supreme Court has held that the Fourteenth Amendment makes the guarantee of this clause obligatory upon the states. (*Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065].) One of the most basic of the rights guaranteed by the confrontation clause is the accused's right to be present in the courtroom at every stage of his trial. (*Lewis* v. *United States* (1892) 146 U.S. 370 [36 L.Ed. 1011, 13 S.Ct. 136].)

■ The defendant's constitutional right to be present at his trial can be surrendered, however, if it is abused for the purpose of frustrating the trial. (*Illinois* v. *Allen* (1970) 397 U.S. 337 [25 L.Ed.2d 353, 90 S.Ct. 1057].) The right to be present can be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings. (*Id.*, at p. 343 [25 L.Ed.2d at p. 359].)

Consistent with *Illinois* v. *Allen* is California Penal Code section 1043 which requires that a defendant in a felony trial be personally present at trial. However, if the defendant insists on conducting himself in a ''disorderly, disruptive and disrespectful'' manner, so that the trial cannot be carried on with him in the courtroom, the defendant may be removed from the courtroom after proper warning by the judge. (Pen. Code, § 1043, subd. (b)(1).)

■ More importantly for purposes of this case, the court is entitled to try a defendant for an offense which is not punishable by death without the defendant's presence in the courtroom if the defendant voluntarily absents himself.[7] This provision was designed to prevent a defendant from intentionally frustrating the orderly process of his trial by voluntarily absenting himself from the courtroom. (*People* v. *Connolly* (1973) 36 Cal.App.3d 379, 384 [111 Cal.Rptr. 409].)

The criteria for determining ''voluntariness'' in the context of Penal Code section 1043, subdivision (b)(2) are set forth in *People* v. *Connolly, supra,* 36 Cal.App.3d at pages 384-385, where the court reviewed the relevant law as follows: ''[S]ection 1043, subdivision (b)(2), was an adoption of the majority rule in the United States. [Citations.] Strikingly similar to section 1043, subdivision (b)(2), is rule 43, Federal Rules of Criminal Procedure,

---

[7]Penal Code section 1043, subdivision (b)(2) provides in pertinent part: ''The absence of the defendant in a felony case after the trial has commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases: . . . (2) Any prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent.''

which provides, in pertinent part: 'In prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict.' The essential elements of section 1043, subdivision (b)(2), and rule 43 are the same. We, therefore, look to several federal cases for guidance.

" . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"In the first *Cureton* case (*Cureton* v. *United States* (D.C.Cir. 1968) 396 F.2d 671 . . .), the court concluded 'that if a defendant at liberty remains away during his trial the court may proceed provided it is clearly established that his absence is voluntary. He must be aware of the processes taking place, of his right and of his obligation to be present, and he must have no sound reason for remaining away.' (396 F.2d at p. 676.)

" . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Defendant's constitutional right to be present at trial is involved and consequently, the rule formulated in the *Cureton* cases should be the appropriate test—i.e., that defendant's absence was knowing and voluntary . . . ."

Not only must defendant's absence be "knowing and voluntary," in California, the absence also must occur *after* the trial has commenced. By its terms, Penal Code section 1043, subdivision (b) only allows the proceedings to continue without the defendant if "the *trial has commenced* in his presence." (Italics supplied.) The obvious issue—when does a trial "commence" for purposes of this statute?

*People* v. *Molina* (1976) 55 Cal.App.3d 173 [127 Cal.Rptr. 434] was the first case to construe this phrase in the context of Penal Code section 1043, subdivision (b)(2). The defendant was present while 11 jurors were selected but failed to appear for the completion of jury selection. Relying on section 12, subdivision (b)(1) of the Evidence Code, which states that a trial does not commence until the first witness is sworn or the first exhibit is admitted, the *Molina* court held that for purposes of Penal Code section 1043, subdivision (b)(2) a trial does not commence until the jury is impaneled or the first witness is sworn. (*Id.* at p. 177.)

In the instant case, appellant did not wait until 11 jurors had been selected. He expressed his intention not to participate in the trial even before the voir dire of the jury was begun. Yet in the circumstances of this case we do not deem it appropriate to read the Evidence Code definition of when a

trial commences into Penal Code section 1043, subdivision (b). Instead we adopt what seems to us the sensible approach. We interpret the rule in its context and according to its rationale. We look to the reason for requiring the trial to have "commenced" before allowing a defendant's absence to waive his constitutional rights in felony cases. In doing so, we find the reason to be completely different from the rationale underlying Evidence Code section 12, subdivision (b)(1) or other definitions which have tended to consider a trial to begin only after the jury is sworn or the first witness starts to testify.

The only function of Evidence Code section 12, subdivision (b)(1) is to demark which proceedings are governed by the Evidence Code enacted in 1967 and which may proceed under earlier rules. Indeed at this stage, some 16 years after enactment of the code, section 12, subdivision (b)(1) probably has no practical effect. In essence the section meant that unless a witness had been sworn or an exhibit admitted before January 1, 1967, the proceedings had to comply with the "new" Evidence Code. That definition made perfect sense given the policies it implemented. If no evidence had yet been taken, there was no reason to exempt a trial from the new evidence rules, even if voir dire had started or been completed. But if some evidence had been introduced under the old law it was deemed unwise to shift rules in midstream and the trial was allowed to continue under the prior evidence provisions.

In the context of double jeopardy, a different rationale is at play. This leads to a slightly different definition of when a trial "commences." In jury cases, an accused cannot be said to have been truly in "jeopardy" until the judge swears a jury empowered to convict that defendant. Hence, the swearing in of the jury becomes the critical point for purposes of a "once in jeopardy" defense. (*People* v. *Young* (1929) 100 Cal.App. 18 [279 P. 824]; *Jackson* v. *Superior Court* (1937) 10 Cal.2d 350 [74 P.2d 243, 70 A.L.R. 475]; 1 Witkin, Cal. Crimes (1963) § 190, pp. 182-183.)

Still different considerations, however, shape the definition of when a trial commences under Penal Code section 1043. Here at least two policy goals can be discerned. First, in the defendant's best interests, we want to *insure* he has voluntarily and knowingly waived his right to be present for his trial. Unless he is present in court and confronts the judge, we can never be certain his absence is truly voluntary and knowing. Secondly, in the best interests of the judicial system, we want to avoid claims, perhaps spurious and certainly difficult to disprove, that the defendant was absent because he could not find the courtroom or thought the trial started on a different day, or another of the thousand and one explanations for failing to appear in the appointed place at the appointed time. At best, courts might have to retry a

host of cases because the trial proceeded in the absence of a defendant who it turns out wanted to be there and had not waived his right to do so. At worst, double jeopardy might foreclose retrial because a defendant had been placed in jeopardy by a trial which was voided by his unknowing and unwilling absence.

Since the only function is to insure the defendant really makes a voluntary and knowing waiver of his right to be present at the trial proceedings, it is not necessary that the jury have been sworn or the first evidence introduced. It is enough the defendant is physically present in the courtroom where the trial is to be held, understands that the proceedings against him are underway, confronts the judge and voluntarily says he does not desire to participate any further in those proceedings.[8]

We are not unmindful of the grave danger of initiating trial proceedings or conducting trial without a defendant's knowledge or presence. The right to confront one's accusers is fundamental to our system of justice and guaranteed by our Constitution. In the present case, however, appellant was informed of the charges against him and was present in court at the time appointed for trial to begin. It was only when the official voir dire proceedings began that defendant refused to participate. If he were not in custody, the defendant might have merely walked out of the courtroom at the first opportunity, never to return. As it was, he could not be absent from the courtroom without the trial judge's consent. Defendant Lewis not only told the judge in no uncertain terms he did not wish to participate any longer in the trial, he threatened further disruptions if compelled to remain. The court in effect yielded to that threat and granted defendant's request to be physically absent during the rest of the trial proceedings. The court advised defendant of his right to be present at trial before each session commenced, yet appellant reiterated his desire to remain in the lockup rather than to participate in the trial.

We hold that by words and conduct appellant waived his right to be present voluntarily and with full knowledge that the trial was continuing without his presence. In view of these circumstances, we conclude that no manifest need was required to justify compliance with defendant's request to be absent from the courtroom during his trial.[9]

---

[8]Defendant Lewis expressly informed the judge he did not want to participate any further in his trial. Consequently, we need not reach the issue posed by noncustody defendants who merely leave the courtroom at the beginning of or during voir dire, never to return, as in *People* v. *Molina, supra,* 55 Cal.App.3d 173, and like cases.

[9]We do not reach the issue of whether manifest need may be required to justify removing a defendant who indicates a desire to remain in the courtroom during trial.

## IV. A Sua Sponte Instruction About Defendant's Removal Was Not Required Where Voir Dire and Earlier Admonishments Addressed This Issue

■ Appellant contends that it was error for the trial court not to instruct the jury *sua sponte* to disregard the defendant's absence from the courtroom in determining his guilt or innocence.

To reduce any prejudice that the use of physical restraints may create in the minds of jurors, when visible restraints, such as shackles or handcuffs, are imposed on a criminal defendant during trial, the court must instruct the jury *sua sponte* that such restraints should have no bearing on the determination of defendant's guilt. (*People* v. *Duran, supra,* 16 Cal.3d 282, 291-292.) When the restraints are concealed from the jury's view, however, the instruction should not be given unless requested by the defendant, since it might draw initial attention to the restraints and thus create prejudice which would otherwise be avoided. (*Id.* at pp. 291-292.)

While it is well settled that it is the duty of the court in criminal cases to instruct the jury, even upon its own motion, on any points of law pertinent to the issue or necessary for their guidance on hearing the case, there are limitations on the court's duty. (Pen. Code, § 1093, subd. 6; Witkin, Cal. Criminal Procedure (1978 supp.) Trial, §§ 471 and 472.) Before a determination can be made whether a trial court complied with its obligation to provide the jury with proper legal rules for resolution of the issues in a particular case, the facts of the case must be analyzed in the context in which they occurred. (*People* v. *Wilson* (1967) 66 Cal.2d 749, 759 [59 Cal.Rptr. 156, 427 P.2d 820]; *People* v. *Coleman* (1970) 8 Cal.App.3d 722, 733 [87 Cal.Rptr. 554].)

In the present case, the defendant's statements that he refused to participate in the trial were made during voir dire. The jury therefore knew why the defendant was not present in the courtroom. During voir dire, defense counsel asked the jury venire as a group whether appellant's conduct and absence from the courtroom would have any prejudicial effect. All jurors shook their heads in the negative. In addition, the trial court advised the jury panel that appellant was in the adjacent room listening to the trial proceedings and inquired of the jury panel whether his absence would influence them as prospective jurors. Each juror indicated that it would not.

Furthermore, each juror who actually sat on appellant's case was asked either by defense counsel or by the court, or sometimes by both, whether defendant's outburst in the courtroom and absence from the courtroom during the trial proceedings would prejudice them in any way. Each juror in-

dicated that it would not. And the trial court admonished the jury during voir dire that the incident was not to be discussed or considered by them in determining appellant's guilt or innocence.

In view of this set of facts, we find no error in the trial court's failure to instruct the jury *sua sponte* at the conclusion of the trial regarding defendant's absence from the courtroom during the proceedings. Indeed, further reference to defendant's absence may have served to recall the defendant's outburst to the jurors' minds and, perhaps, distracted them from the evidence. (See CALJIC No. 1.00.)

## V. Summary

Under the circumstances of this case, we hold the trial court's actions fell within the range of permissible conduct. However, the right to be present and confront the witnesses against oneself is a fundamental constitutional guarantee. It should not be surrendered lightly. In many similar situations, it would be preferable for the trial court to take other steps before assenting to the defendant's absence. For instance, the court could declare a recess and allow defense counsel a few minutes to calm his client. As an alternative or additional measure, the court itself might attempt to cajole the defendant, explaining why it is in his best interests to participate in his trial and without further disruption. These steps would be especially important where defendants exhibit less determination than appellant did in this case.

We also feel constrained to highlight another limitation on our holding in this case which was mentioned in passing earlier in the opinion. We do not hold that a defendant may be removed *involuntarily* from the courtroom without a showing of "manifest need." We find it unnecessary to reach this issue since appellant voluntarily chose to be absent. He was "removed" only because he was in custody and therefore could not be excused from the courtroom in any other way. Thus we also do not find it necessary to consider whether appellant's behavior coupled with his threats to continue that behavior constituted "manifest need" justifying involuntary removal from the courtroom.

## Disposition

Because we find no error in the court below, we find it unnecessary to consider whether such error would be harmless. However, we do note that we reviewed the record of the trial and found the evidence more than sufficient to support a verdict of guilty beyond a reasonable doubt.

The judgment is affirmed.

Schauer, P. J., and Thompson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 11, 1983. Mosk, J., was of the opinion that the petition should be granted.